**Willie M. WILSON, Plaintiff,**

v.

**MICHIGAN BELL TELEPHONE COMPANY, a Michigan Corporation, Defendant.**

**Civ. A. No. 80 71849.**

United States District Court, E.D. Michigan, S.D.

Nov. 18, 1982.

Willie M. Wilson, in pro. per.

Anthony A. Haisch, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Willie Nelson, a black male, filed his complaint in this employment discrimination suit on May 13, 1980, pursuant to Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. § 2000e, *et seq.* Attached to his complaint was the Right-to-Sue letter of the United States Equal Employment Opportunity Commission, dated February 28, 1980, which noted a finding that "No reasonable cause was found to believe that the allegations made in your charge are true, as indicated in the attached determination." Plaintiff's charge had been filed on April 11, 1978, and claimed (as does this lawsuit) that defendant Michigan Bell had discrimi-

natorily failed to hire him because of his race, on April 11, 1978.

Plaintiff has appeared in pro per in this court, utilizing a form complaint, and representing himself at trial after withstanding defendant's motion to dismiss on October 30, 1981. Trial was had for one day on August 24, 1982, and the parties have filed post-trial briefs. On the basis of the findings of fact and conclusions of law outlined below, it appears to this court that plaintiff has failed to present a *prima facie* case of employment discrimination and that, accordingly, his complaint must be dismissed.

The facts are largely undisputed. Plaintiff applied to defendant for employment by a letter of December 8, 1977, which sought a position which would permit him "to utilize my abilities in verbal communications, unit coordinations, or public relations." On January 19, 1978, he was interviewed and was advised that the only positions available were at entry level, in sales, and bore a salary of $14,520. Undisputedly, plaintiff then advised the interviewer that he would accept no less than $20,000, and their discussion was terminated by mutual agreement.

On March 13, 1978, the same interviewer [John Fraser] wrote plaintiff as follows:

. . . if you can reconsider your position, I want to further discuss the possibility of your employment in our Marketing Department. I feel you are an excellent candidate and would make a strong contribution toward our revenue goals."

Thereafter, plaintiff notified Fraser of his withdrawal of the requirement of a $20,000 salary, and was directed to report to a "Sales Selection Program" on April 10, 1978, for assessment in greater depth as a candidate for the Marketing Department. Plaintiff did participate in that program and, on April 11, 1978, was called and notified that he had not been selected. He testified that he received a letter of rejection on May 8, 1978 (which is not in evidence) and that at some point prior to the filing of this lawsuit, defendant did offer him a job at the $20,000 salary originally requested, if he would again participate in the assessment program. Plaintiff testified that he refused the offer, because he had been "burned once" by that process.

Plaintiff argues that he was the victim of discrimination in two respects. First, he was told by defendant's agents in January of 1978 that only entry level positions were available, and that all Michigan Bell employees must start at entry level. Nonetheless, he testified that in November of 1979 he read in the "Detroit News" that defendant had hired Mr. Morley Winograd into a "middle management marketing position." This facet of his claim was never presented to the EEOC.

Second, plaintiff claims that the Sales Assessment Program is an employment practice which has a disparate impact upon, and excludes, blacks from employment at Michigan Bell. Plaintiff argues that, by his analysis of defendant's report to EEOC, the program resulted in the hire of 63.8% of the white applicants and 40.9% of the black applicants, during 1977 and 1978. Thus, according to his testimony, the black selection rate during the relevant timespan was 64.1% of the white rate, or 15.9% below the acceptable standard of 80% of the white rate, in accordance with 29 CFR 1607.3D.

Plaintiff further argues that the assessment center device is not a valid predictor of job performance; and to support that argument he placed into evidence an article by Messrs. D.W. Bray and R.J. Campbell of American Telephone and Telegraph Company, New York City, entitled "Selection of Salesmen by Means of an Assessment Center," *Journal of Applied Psychology,* Vol. 52, No. 1, Part 1, February, 1968. Plaintiff interprets that article to disprove the validity of the assessment center program by a statement that its ratings do not necessarily correspond with subsequent supervisory ratings (although they *do* fairly predict the subsequent job performance ratings of trained field review teams).

In essence, plaintiff's claim is that he was the victim of both intentional disparate treatment because of his race, and of the unlawful disparate impact of an invalid and discriminatory selection procedure. Accord-

ingly, his claim must be analyzed under both theories of Title VII liability. Such analysis reveals that plaintiff has failed to make a *prima facie* case under either.

The Supreme Court stated in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977):

> "Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. *Proof of discriminatory motive is critical,* although it can in some situations be inferred from the mere fact of difference in treatment .... Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. *See infra,* at 349 [97 S.Ct. at 1861]. Proof of discriminatory motive, we have held, is not required under a disparate impact theory. *Compare, e.g. Griggs v. Duke Power Co.,* 401 U.S. 424, 430–434 [91 S.Ct. 849, 853–855, 28 L.Ed.2d 158], with *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802–806 [93 S.Ct. 1817, 1824–1826, 36 L.Ed.2d 668]. 431 U.S. at 335 n. 15, 97 S.Ct. at 1854. (Emphasis added.)

■ Plaintiff's claim here that he was not permitted to compete for a job above entry level in January of 1978, although he read in the press in November, 1979 that a white man, Morley Winograd, had been hired into middle management, is a claim of disparate treatment. In *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, the Supreme Court established the order and allocation of proof in a private, individual, Title VII action. This Circuit, most recently in *Rowe v. Numerical Control, Inc.,* 690 F.2d 88 (6th Cir. 1982), again reiterated the *McDonnell-Douglas* requirements, as follows:

The plaintiff in a Title VII trial must carry the initial burden of establishing a *prima facie* case of racial discrimination. The Supreme Court made it clear that a *prima facie* case is established by showing that (1) plaintiff belongs to a racial minority; (2) plaintiff applied and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications plaintiff was rejected; and (4) after plaintiff's rejection, the position remained open and the employer continued to seek applicants for persons of plaintiff's qualifications. 411 U.S. at 802 [93 S.Ct. at 1824]. [At p. 95.]

■ When the plaintiff has proved such a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for rejecting the plaintiff. A *prima facie* case may also be made in "proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those acts were bottomed on impermissible considerations." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

■ Here, plaintiff has failed to make a *prima facie* case of discriminatory disparate treatment and accordingly shifted no burden to defendant to articulate a legitimate reason for the rejection. Indeed, the only element of a *prima facie* case proved has been plaintiff's minority status. There are no proofs of what qualifications were in 1978, for "middle management" jobs in defendant's hierarchy, or that plaintiff possessed those qualifications. There is no evidence that defendant sought employees at middle management when plaintiff applied: indeed, the only testimony is plaintiff's that he was told *only entry level jobs were available* in January, 1978. There is no evidence that defendant continued to seek persons of plaintiff's qualifications after his rejection; for middle management, or indeed at entry level either, because all new entrants had succeeded in the assessment program. There is no evidence that the job into which

plaintiff heard that Mr. Morley Wingorad was hired in November of 1979 had existed or been open at the time plaintiff sought employment in spring of 1978, and no evidence of Mr. Winograd's qualifications. Indeed, a question is raised as to whether plaintiff was rejected as a candidate for middle management during 1979, because his testimony is that he was offered a $20,000 job sometime prior to filing this lawsuit, but refused to participate in the assessment program again. In *Grano v. Department of Development of the City of Columbus,* 637 F.2d 1073, at footnote 7, p. 1081, the Sixth Circuit admonished that:

Because discriminatory intent is so difficult to prove by direct evidence, it is incumbent upon a sensitive decision maker to analyse all of the surrounding facts and circumstances to see if discriminatory intent can reasonably be inferred. *See Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

This court has, accordingly, analysed all of the surrounding facts and circumstances described by plaintiff here, and can find no suggestion of racial animus or discriminatory intent in the record. In short, plaintiff has failed to make a *prima facie* case of disparate treatment.

■ Plaintiff's next claim, that the Sales Assessment Program which rejected him is a facially neutral but unlawful employment practice because it selects employees in a racial pattern significantly different from the general pool of applicants, is a claim of disparate impact. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). When a plaintiff has made the *prima facie* case of demonstrating such impact, then the defendant must present evidence that the challenged test, procedure, or requirement, bears "a manifest relation to the employment in question." *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), quoting *Griggs, supra;* unless the procedure in question is encompassed within a statutory exception. See *Teamsters, supra.*

■ Then, as the Sixth Circuit wrote in *Rowe v. Numerical Control, supra:*

Finally, if an employer does carry his burden and demonstrates that the "test" is job related, the plaintiff must be permitted an opportunity to prove that another practice would serve the employer's business needs equally as well but without the undesirable racial impact. *Albemarle Paper Co.,* 422 U.S. at 425 [95 S.Ct. at 2375]. Such proof is evidence that the employment practice is being used merely as a pretext for discrimination. (At p. 94).

It appears to this court, as it did to the Sixth Circuit in the *Rowe* case, that:

. . . the basic problem in the present case, insofar as the statistical evidence is concerned, is that it was totally inadequate to show the impact—much less a substantially disproportionate impact—of the selection process in question. (At p. 94).

The difficulty with the pass-fail data which plaintiff placed into evidence concerning the assessment center which disqualified him is that there is no discernible evidence within the data, or testimony, as to the race of the applicants. If, to overcome that hurdle, the court accepts plaintiff's testimony that the data indicates the success of 63.8% of the white applicants but of only 40.9% of the black applicants, then it appears nevertheless that the job-relatedness of the assessment center was established by the *Journal of Applied Psychology* Article which plaintiff himself placed into evidence.

The job-relatedness of the assessments is further established by the testimony of defendant's only witness, Ms. Joan Vergil, a black female marketing manager of defendant's sale department who was a permanent member of the Assessment Staff in 1977 and 1978. She had undergone intensive training in the assessment process in Pennsylvania during 1975, and participated in the assessment of plaintiff by which the five assessors had unanimously graded him "not acceptable" in 1978.

As to the Article: plaintiff's contention that it demonstrates the invalidity of assessments because subsequent supervisory ratings are not consistent therewith is off the mark. If anything, that finding suggests a need for closer examination of the criteria supporting supervisory ratings (a problem not before us). The salient point of that article, for these purposes, is that assessments made under that program were concluded to bear a strong relationship to subsequent job performance as rated by a trained field review team which measured employees by the same uniform and specific criteria which had been the basis of the pre-employment assessments. Moreover, those candidates with *low* assessments had been retained, for the purpose of full evaluation of the accuracy of all predictions made. ·

> The conclusion of the article was that: Studies of the Bell System assessment center for the prediction of success in management positions have, however, uniformly shown that the method has substantial validity. This has been true whether the assessment staff consisted primarily of professional psychologists or of specially trained management personnel. The present study demonstrates that an assessment center staffed by sales managers instructed in assessment techniques can be a valuable aid in the selection of prospective salesmen.

Accordingly, the scientific article presented by plaintiff tends to establish the job-relatedness of his assessment, and not the converse.

Defendant also articulated the job-relatedness of the Assessment Center through the testimony of its one witness, Ms. Vergil, after the court denied its motion to dismiss at the close of plaintiff's case. The court had denied the motion because plaintiff's testimonial description of the statistical data and scientific article, neither of which the court had yet read or examined, led the court to believe that a *prima facie* case of disparate impact had been made.

But Ms. Vergil's testimony clearly articulated the job-relatedness of the assessment procedure. Her testimony also made it abundantly clear that the evaluation of applicants is not left to the exercise of unrestricted subjective supervisory discretion; and that the evaluations of assessors are required to be fully justified and explained in a supervised discussion among the five evaluators at the conclusion of each day's activity. Ms. Vergil explained the score sheet which she and her four associates had executed after assessing plaintiff. Numerical ratings from one to five are made in 14 different job-related categories, and an "overall acceptability" conclusion must be noted by each. Plaintiff was unanimously found to be unacceptable, and that finding was supported in the low grades given in all categories.

Ms. Vergil further articulated legitimate reasons for certain conduct which plaintiff had testified demonstrated racial animus. The harsh challenges made by one assessor were to elicit plaintiff's skill in "oral defense," she explained. Plaintiff felt that person's confrontational attitude had been based upon his race, although he had no knowledge as to the attitude taken with other applicants. Ms. Vergil explained that the confrontation was a uniformly applied facet of the "role-playing" upon which assessments are based.

Plaintiff also testified that he had not been offered the opportunity to make a written justification of his positions, as is required by the procedure described in the Applied Psychology Journal. However, he had submitted a writing on his own initiative the next day, he said. Ms. Vergil's testimony was more credible in this regard; and was that plaintiff and every other candidate was given one hour for a written presentation immediately after the role-playing activity concludes. Plaintiff was notified of his rejection, the next day. However, even if plaintiff had *not* been invited to submit a written piece, he offered no evidence that similarly situated whites were treated differently.

In all, this court cannot find a *prima facie* case of either disparate treatment or disparate impact, here. Moreover, if the court

accepts plaintiff's personal statistical analysis at face value as proof of disparate impact, that impact has been explained by ample evidence of the job-relatedness of assessments, and plaintiff has suggested no rebutting evidence of other less racially differential and equally predictive selection procedures, or any other evidence suggesting pretext.

Therefore, on the basis of the findings of fact and conclusions of law stated above, plaintiff's complaint must be and hereby is dismissed.

IT IS SO ORDERED.