863 F.2d 49
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Lucy H. MADDOX, Plaintiff-Appellant,
v.
INTERNAL REVENUE SERVICE DATA CENTER, Defendant-Appellee.
 No. 87-1358.
 United States Court of Appeals, Sixth Circuit.
 Nov. 21, 1988.
 
 Before WELLFORD and DAVID A. NELSON, Circuit Judges, and ROBERT M. McRAE*, Senior District Judge.
 PER CURIAM.
 
 
 1
 Plaintiff Lucy Maddox appeals from the district court's dismissal of her claim that her supervisor, Mary Velkoff, denied her promotion opportunities in violation of Title VII because of her race. The district court concluded that Maddox failed to prove intentional discrimination and entered a judgment for the defendant, Internal Revenue Service Data Center (IRSDC). We affirm.
 
 
 2
 Maddox worked for IRSDC as a personnel staffing assistant. She has a college degree and earned a Master's degree in personnel management from Goddard College in Vermont while working for IRSDC at Detroit. She had been a personnel staffing assistant for two years at the time she sought promotion to a position as personnel staffing specialist, which became available in 1981. The duties of the position she sought are somewhat similar to those in which she had served. Generally, a specialist rates applicants for positions of GS-8 and above, while an assistant rates applicants for positions of GS-7 and below.
 
 
 3
 In 1981 the personnel staffing section of the Data Center was divided into three teams which were under the supervision of Mary Helen Velkoff, Chief of the section. A team consisted of one clerical, one assistant, and one specialist. The three assistants whom Velkoff supervised, Maddox, Bonnie Duchateau and Cindy LeBlanc, all applied for the several specialist positions which became available. Seventy-two persons applied for the positions in controversy.
 
 
 4
 The selection process for the specialist positions is very structured. The vacancy announcement issued on March 27, 1981 stated the qualifications required for the position. Maddox was one of only nineteen applicants who met the threshold requirements.
 
 
 5
 Once the field of applicants was thus narrowed, the applicants were next selected for a "highly qualified" list. In order to attain this listing, the applicants would be rated according to a current job evaluation, relevant incentive awards, past experience and training and their score on "Test 14." The IRS has express written directions on applying these criteria to determine those who would make the highly qualified list. To be rated highly qualified, an applicant had to obtain a score of at least 100. The vast majority of potential points came from points assigned to the applicant's job evaluation and the score the applicants received on standardized IRS Test 14. A maximum of two points was available for past awards at the IRS and a maximum of six points was available for training and education.
 
 
 6
 Since the job evaluation was completed by the applicant's immediate supervisor, Velkoff evaluated Maddox, Duchateau, and LeBlanc. Maddox received a score of forty-two, LeBlanc received a forty-six and Duchateau received a forty-five on this evaluation.
 
 
 7
 Test 14 has two forms, A & B, that can be used interchangeably. Each form has different questions and requires a different answer key. The personnel staffing section is responsible for administering the employment test. Because the position to be filled happened to be in the section responsible for administering the test, it was important to find a test not used previously by the personnel staffing section. Test 14 had not been used previously. Maddox contends that only a person whose name was on a roster for administering a Test 14 could validly administer these tests. Velkoff administered these tests to her three assistants, including Maddox, and then they administered the test to the remaining applicants. Velkoff's name, however, was not on a roster for administering these particular tests. After hearing extensive testimony, the district court found as a fact that no roster existed.
 
 
 8
 Administering the test involves no more than distributing the tests, proctoring during the allotted time, and scoring the tests using a grid card to check darkened circles. After one person scores the test, another person checks the scoring using the same grid card. Velkoff scored Maddox's test and Rosa Cliff, a black female, rechecked Velkoff's scoring of Maddox's test. Cliff found no error in the scoring on Maddox's test. Maddox contends there was some confusion as to what form of Test 14 she took and that the wrong answer key was used. Velkoff testified that both the form A test and answer key were used. The IRS, however, was unable to provide the answer sheet at the trial even though IRS procedures require that the answer sheets be retained. The IRS did produce the score record and notification which indicated that form A was used and Maddox's score was thirty-two. The district court concluded, after hearing the testimony of the witnesses, that the scoring was accurate on all tests involved, including the Maddox test.
 
 
 9
 Maddox's raw score of thirty-two on the test converted to twenty-eight of the one hundred points needed for a highly qualified rating. This was at or near the bottom of the raw scores achieved by any of the nineteen applicants. Taking into account Maddox also received one of the lowest scores on her job evaluation (her forty-two converted to a fifty-three toward the one hundred), the combination of these factors gave her the lowest total score of any applicant. (She also received five points for her education and one point for her awards.) Because Maddox did not achieve the required one hundred points, she did not make the "highly qualified" list and was no longer considered for any of the PSS positions.
 
 
 10
 Thirteen people made the highly qualified list, of whom were six whites and seven blacks. These remaining applicants were screened once again in respect to the best qualified list. Persons made the best qualified list based on an evaluation of past experience and scoring on an interview before a three person ranking panel, with the interview given more weight. The ranking panel finally selected three whites and three blacks for the best qualified list.
 
 
 11
 The official making the selection of the specialist is the person under whom the candidate would work. In this case, Velkoff was the person to select two persons from the best qualified list. She selected two whites, LeBlanc and Kurt Utich. After exhausting her administrative remedies without success, Maddox filed a timely suit claiming a violation of Title VII.
 
 
 12
 Plaintiff argues that the district court erred by not addressing a disparate impact theory to show intentional discrimination. Under appropriate circumstances, a Title VII discrimination claim may be proven by either a disparate treatment or a disparate impact theory. Rowe v. Cleveland Pneumatic Co., 690 F.2d 88, 92 (6th Cir.1982). In order to prevail under the disparate treatment theory, articulated in McDonnell-Douglas, the plaintiff must demonstrate that the employer has treated some persons less favorably than others because of their race, color, religion, sex, or national origin. Id. "In such a case, proof of a discriminatory motive is critical. However, in some cases it may be inferred from the mere fact of differences in treatment." Rowe, 690 F.2d at 92. See also Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).
 
 
 13
 Under a disparate treatment theory, the plaintiff has the burden to make a prima facie showing of discrimination. McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Once a prima facie case is demonstrated, the defendant must articulate a "legitimate non-discriminatory reason for the employment decision." Burdine, 450 U.S. at 256. Finally, the plaintiff must show that the reason articulated is not the true reason for the employment decision, that it is rather merely pretextual. Id. Once, however, the plaintiff and the defendant have met their burdens of production--the only question before the district court is whether "the defendant intentionally discriminated against the plaintiff." United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 715 (1982); Burdine, 450 U.S. 253. The burden of persuasion for this final question rests on the plaintiff. Id.
 
 
 14
 The second alternative a plaintiff has is to pursue her claim under a disparate impact theory. Simply put "the disparate impact doctrine of Griggs v. Duke Power Co., ... requires that the plaintiff demonstrate that a facially neutral employment practice ... falls more harshly on one group than another and that this practice is not justified by business necessity. Under this theory, proof of discriminatory intent is not required." Rowe, 690 F.2d at 92.
 
 
 15
 The burdens of production are also allocated. The plaintiff must show that a facially neutral procedure results in employment decisions significantly different than as reflected by the applicant pool. Id. at 93. Then the defendant, must show that the procedure has a legitimate business purpose. Id. If the defendant makes that showing, the plaintiff must show that other procedures would satisfy this legitimate business purpose "without the undesireable racial impact," id. at 94, and the evidence must show that the procedure was used as a pretext for discrimination made illegal under the act. Id. The plaintiff may proceed on either theory or both theories, if the facts and evidence support either theory and if they are properly alleged. Page v. U.S. Industrial, 726 F.2d 1038, 1046 (5th Cir.1984). The district court in this case focused on the disparate treatment theory.
 
 
 16
 The district court's focus on disparate treatment is supported by the fact that the plaintiff did not pursue a disparate impact theory. At pre-trial only the three step disparate treatment analysis was listed, and during trial, plaintiff unsuccessfully tried to raise a disparate impact theory but withdrew it upon objection by defendant. Plaintiff also did not mention the disparate impact theory in her closing argument. See Daniels v. Board of Education of Ravenna City School, 805 F.2d 203, 210 (6th Cir.1986).
 
 
 17
 In any event, plaintiff has failed to produce any evidence to support a disparate impact theory. While the disparate impact theory can be applied in appropriate circumstances to subjective employment practices, the statistical evidence "must be sufficiently substantial that they raise an inference of causation." Watson v. Ft. Worth Bank & Trust, 108 S.Ct. 2777, 2789 (1988). Clearly, plaintiff's evidence pertaining to this one employment decision does not begin to meet the standards required to establish a disparate impact case. See generally, id.; id. at 2794 (Blackmun, J., concurring) (requiring a "significant statistical disparity"). The evidence, to the contrary, indicates that no racial disparity existed. Of the nineteen applicants who took Test 14, thirteen made the highly qualified list, seven blacks and six whites. After the entire process, the six finalists consisted of three whites and three blacks. Plaintiff is left with the sole argument that Velkoff discriminated against her, or treated her unfairly. The evidence of plaintiff's case involved only a single hiring decision, not a pattern or series of job placements. The district court correctly focused on the disparate treatment theory; there was no showing of disparate impact.
 
 
 18
 Applying the disparate treatment analysis, the district court made findings of fact and reached the conclusion that Velkoff did not intentionally discriminate against Maddox: "plaintiff has failed to meet her burden of proof that she was intentionally discriminated against because of her race or color." Plaintiff claims that the trial court applied the wrong standard because the court required plaintiff to show that Velkoff intentionally discriminated against Maddox because of her race. The plaintiff argues that under the disparate treatment theory "it is not necessary to show a clear purposeful intent to discriminate on the part of the Defendant."
 
 
 19
 The district court's finding regarding the existence of intentional discrimination in a Title VII case is a finding of fact. Pullman-Standard v. Swint, 456 U.S. 273, 287-88 (1981). See also, Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985).
 
 
 20
 The determination in this case is based upon essential factual findings and Federal Rule of Civil Procedure 52(a)'s clearly erroneous standard applies here. Anderson, 470 U.S. at 573; Pullman-Standard, 456 U.S. at 288; Daniels, 805 F.2d at 209. In Aikens, 460 U.S. at 717, the Court stated that, "The District Court erroneously thought that the respondent was required to submit direct evidence of discriminatory intent, ... and erroneously focused on the question of prima facia case rather than directly on the question of discrimination." Id. Because of the misapplication of the law, the Court reversed.
 
 
 21
 The district court did not make the error to which the Court objected in Aikens. In a disparate treatment case, the plaintiff must produce evidence from which a court can infer discriminatory intent, or evidence directly showing discriminatory treatment. Such evidence may be either circumstantial or direct. The evidence presented in this case must have convinced the district court by a preponderance of the evidence that intentional discrimination based on race occurred. Plaintiff had the burden to produce evidence showing that she and similarly situated persons were treated disparately or unfairly based on race. The district court reasoned that under the facts presented, the only way to find intentional discrimination was to consider whether plaintiff demonstrated that Velkoff intentionally misscored or lied about plaintiff's score on the standardized tests. The district court found that no such indiscretions or errors based on Maddox's race occurred.
 
 
 22
 The findings of the district court were not clearly erroneous. It was the responsibility of the district court to weigh the credibility of the witnesses, after hearing all of the witnesses testify about the administration and scoring of the tests in question. There is substantial evidence in the record of the testimony to support the district court's findings. While we are uncomfortable with the defendant's inability to produce the answer sheet on which Maddox answered the Test 14 questions, the sheet on which plaintiff's scores were recorded and rescored was produced. The district court concluded that no one intentionally misscored plaintiff's test. We cannot find that this determination is clearly erroneous. Failure of IRSDC to preserve the answer sheet is a factor, however, that may be weighed against the defendant.
 
 
 23
 After weighing the evidence, including the circumstances of the missing answer sheet, the district court was not convinced that any wrongful scoring occurred. Since the district court's decision was not clearly erroneous, we AFFIRM.
 
 
 
 *
 THE HONORABLE ROBERT M. McRAE, United States District Court for the Western District of Tennessee, sitting by designation