**Sherry E. GALBRAITH,**
**Plaintiff–Appellant,**

**James R. Hunter, Plaintiff,**

**v.**

**NORTHERN TELECOM, INC.,**
**Defendant–Appellee,**

**Jeffrey Eason, Defendant.**

**No. 90–5575.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 23, 1991.

Decided Sept. 10, 1991.

Rehearing and Rehearing En Banc
Denied Oct. 28, 1991.

Rebecca Lyford (argued and briefed), Nashville, Tenn., for Sherry E. Galbraith and James R. Hunter.

Kenneth E. Douthat (argued), Thomas B. Dean (briefed), King & Ballow, Nashville, Tenn., for Northern Telecom, Inc. and Jeffery Eason.

Before GUY and BOGGS, Circuit Judges, and EDWARDS, Senior Circuit Judge.

BOGGS, Circuit Judge.

Sherry E. Galbraith, a white woman, and James Hunter, a black man, brought separate employment discrimination actions against their employer, Northern Telecom, Inc. Plaintiffs alleged that they had been fired for dating one another, in violation of 42 U.S.C. § 2000e. The cases were referred to a magistrate for expeditious treatment pursuant to 42 U.S.C. § 2000e–5(f)(5) and subsequently consolidated.

After an evidentiary hearing, the magistrate found that both parties had established a *prima facie* case of disparate treatment. He found further that Northern Telecom had articulated a legitimate nondiscriminatory reason for discharging Hunter and that Hunter had not met his burden of proving, by a preponderance of the evidence, that the reason was pretextual. With respect to Galbraith, the magistrate found that no legitimate nondiscriminatory reason for her discharge had been proffered by Northern Telecom. Therefore, he recommended an award of backpay. The case against Eason was dismissed by an agreed order.

Hunter and Northern Telecom filed objections to the magistrate's report with the district court. *See* Fed.R.Civ.P. 72(b). Reviewing the record *de novo*, the district judge rejected the magistrate's finding that Northern Telecom had not articulated a legitimate nondiscriminatory reason for discharging Galbraith. He also found that the reasons given, abuse of the leave policy, was not pretextual. With respect to Hunter, however, the district judge upheld the magistrate's report. The claims of

both plaintiffs were dismissed with prejudice.

Galbraith now appeals the dismissal of her case. Hunter has not appealed. Because Eason was dismissed from the case earlier, the only parties before the court are Galbraith and Northern Telecom.

## I

Hunter was hired by Northern Telecom in June 1982. Until the events relevant to this suit began to unfold, Hunter performed satisfactorily and received a promotion. Galbraith was hired in 1981. In November 1984, she and Hunter began dating. Several of Galbraith's co-workers then began to harass her. David Taylor, a supervisor who had attempted to date Galbraith earlier, began to abuse her with racist remarks. Brian McCarty, another supervisor and a friend of Taylor, began job-related harassment in addition to verbal abuse. For instance, he once caused her assembly line to be speeded up and then complained about the resulting backlog of work. Hunter was told by Collier Woods, his department manager, that McCarty was out to get him because he was dating Galbraith. Les Worley, McCarty's supervisor, and Bob Pack, a section leader, called Galbraith a "nigger lover."

Galbraith complained to Jeff Eason, Northern Telecom's communication manager. At his suggestion, Galbraith filed a grievance against McCarty on January 31, 1985. A panel made up of managers and employees ruled against her claim. However, in June 1985, Galbraith had a conference with Fred Parker, Northern Telecom's director of operations, to complain about Taylor, McCarty, and Worsley. On June 7, 1985, McCarty and Taylor were discharged by Northern Telecom, and Worsley was demoted to a position having no supervisory connection with Galbraith. Thereafter, there were no other incidents of racial remarks or racial incidents until Galbraith was discharged in November 1985.

The events proximately leading to this suit began on September 30, 1985, when Hunter was granted emergency personal leave. According to the company's written policy, personal leave is time off granted employees because of emergencies, bereavement, or other nonmedical, personal reasons. Hunter requested leave, he said, because his mother in New Orleans was facing a personal crisis. Company policy specifies that personal leave is not to be granted unless the employee has been absent from the job for more than five days, but because of the nature of Hunter's request, leave was granted on the same day it was requested.

Hunter did not leave immediately for New Orleans. He claims that he used his credit card beyond its limit and had to drive to see his mother. Since his car was not in condition to make the trip, he remained in Nashville for several days waiting for it to be repaired. He did not leave for New Orleans until October 4, arriving there the same day.

On the preceding day, October 3, events critical to this suit unfolded. At around 7:50 p.m., Northern Telecom received a bomb threat and evacuated its building in response. Because 8:00 p.m. was her normal break period, Galbraith remained outside sitting in her car after employees were permitted to return to the building. A person in an automobile drove to within five feet of Galbraith's car and fired five bullets. Two of them hit her in her neck and head. Several employees came to Galbraith's aid. Galbraith recalled that several persons repeatedly asked her whether Hunter shot her. In particular, Howard Appleton, a Northern Telecom security officer, repeatedly asked Galbraith this question. Galbraith, however, claimed that she was unable to identify who shot her. She adhered to this position at the hearing before the magistrate. However, Aubrey Turner, a police officer in the homicide division of the Metropolitan Nashville–Davidson County Police Department interviewed Galbraith at the hospital the day after the shooting. Turner stated that Galbraith told him that Hunter shot her and that she feared additional harm from Hunter, but she was hesitant about prosecuting him. In addition, James Derryberry, a coworker of Hunter, observed Hunter in the

plant parking lot with a beer can in his hand approximately fifteen to twenty minutes prior to the shooting.

Later in the evening of October 3, 1985, Hunter was arrested by the Nashville police for driving under the influence of alcohol. He had not travelled to see his mother, as he told Northern Telecom he had planned. He did leave for New Orleans the next day, after his release from custody. The story of Hunter's arrest was reported in the October 4 evening papers. As one might surmise, whether to terminate Hunter became an issue with Eason and other Northern Telecom officials shortly after the October 3 shooting. On October 5, Hunter was sent a telegram informing him that he had been terminated. The stated reason for Hunter's discharge was abuse of the company's leave policy. Under the relevant policy, obtaining leave under false pretenses is a ground for immediate termination.

After the shooting, Galbraith was taken to the hospital. To follow what happened to her subsequently and the reasons offered by Northern Telecom to explain terminating her employment requires a short explanation of the company's medical leave policy and "leave point" system.

Under Northern Telecom's medical leave policy as summarized in the magistrate's report, medical leave for the type of injury Galbraith sustained is granted "for the length of time required to recover or three months, whichever is less." One-month extensions are available, but "employees who do not notify the Health Center of the status of their leave by the return to work date and also do not return to work on the indicated date will be considered voluntary terminations."

The "leave point" system is an incentive program to encourage punctuality and reliability among employees. Employees who miss work are assessed negative points. When an employee acquires a certain level of negative points, there are various levels of administrative discipline to which she might be subject, with 120 accumulated negative points being grounds for termination. On the other hand, employees with a perfect attendance during a given period are awarded positive leave points. Accumulation of positive points enables employees to miss work occasionally without incurring liability for discipline. According to William Farris, the chief supervisor in Galbraith's section at Northern Telecom, the point system was designed to serve as a "cushion" if an employee were to "run into trouble."

Initially, Northern Telecom officials were sympathetic to Galbraith's plight and her need for medical leave to recuperate from her wounds. Lynn Barber, a personnel official styled "Director of Human Resources," told Galbraith shortly after the shooting that she would be placed on medical leave for as long as her physicians stated that she needed hospitalization. According to Barber's notes, Galbraith's medical leave was set for the period October 3, 1985 to January 3, 1986 because the doctors could not establish "a duration of her injuries."

In late October, attitudes toward Galbraith changed. On the twenty-fourth of that month, Galbraith called Barber to tell her that she had been released by her surgeon, but was under the care of another doctor. She said she did not feel well enough to return to work. Barber then instructed Brenda Lepley of Northern Telecom's health office to contact Galbraith's doctors to determine when she would be fit to return to work. After some initial difficulties in reaching Galbraith's doctors, Lepley secured an opinion that Galbraith could return to work on October 31. On that day, Galbraith called Judy Scribner, her section manager, and told her that she was having trouble finding a baby-sitter and would not be reporting for work. She indicated that she would be remaining away from work on accumulated leave points. Scribner apparently said, "Okay." On November 1 and 2, Galbraith again called Scribner to tell her that she was staying home on accumulated leave points.

On November 4, Galbraith reported for work. She was met at the gate of the Northern Telecom property by security guards and escorted to the personnel of-

fice. There Eason told her that she was being discharged for not returning to work in accordance with Northern Telecom's leave policy. Eason informed her that leave points could not be used to extend medical leave. However, as Northern Telecom's brief concedes, nothing in the company's leave policy prohibits an employee from using leave points after taking medical leave. On the other hand, Galbraith concedes that she understood that failure to return to work after the expiration of medical leave would be considered a voluntary termination of employment.

## II

Before the district court and on appeal, Galbraith points out that a number of other Northern Telecom employees had abused the leave system but had not been discharged for it after their first offense. For example, one employee was terminated for attempting to take undocumented medical leave, but only after a history of excessive absenteeism. A second employee, who was already on probation for excessive absenteeism, was discharged when she failed to contact Northern Telecom after the expiration of medical leave. A third employee also violated medical leave policy but was not discharged until the company decided she was no longer available for work. Galbraith claims that she was treated differently from others similarly situated because of her interracial association with Hunter.

■■■ The magistrate judged her claims by employing the analytical framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which is used for disparate treatment cases. *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.,* 690 F.2d 88, 92–93 (6th Cir.1982). Such a case arises under 42 U.S.C. § 2000e when a plaintiff claims that she has been treated less favorably than others because of her race, color, religion, sex, or national origin. *International Bhd. Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Chrisner v. Complete Auto Transit, Inc.,* 645 F.2d

1251, 1257 (1981). Under *McDonnell Douglas,* a plaintiff has the burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). This burden is not onerous. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094. It may be established by showing that an employer took action adversely affecting the plaintiff's compensation, terms, conditions or privilege of employment under circumstances giving rise to an inference of unlawful discrimination. *Beaven v. Commonwealth of Kentucky,* 783 F.2d 672, 675 (6th Cir.1986). Once this has been done, a presumption of unlawful discrimination arises, which the employer must overcome by articulating a legitimate, nondiscriminatory reason for the adverse treatment. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. Should the defendant employer carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Ibid.* The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Ibid.; Rowe,* 690 F.2d at 92 n. 8.

The magistrate's report began by finding that white persons engaged in interracial associations were a protected class under Title VII, but the bulk of his discussion focused on the second and third elements of the *McDonnell Douglas* framework. The magistrate concluded that the reasons articulated by Northern Telecom for discharging Galbraith were not legitimate. In coming to this conclusion, the magistrate gave substantial weight to the findings of the Tennessee Department of Employment Security ("TDES") when it considered Galbraith's claim for unemployment compensation. In the magistrate's words,

There is substantial evidence that Northern Telecom's proffered reason for termination was not legitimate. As the TDES Board of Review found, Northern Tele-

com's stated reason for discharging Galbraith for this essentially first offense[ ] was not employee job misconduct and thus, not a legitimate business reason to deny Galbraith unemployment benefits.... Although Northern Telecom argues that the point system leave can not be tacked onto medical leave, there is no provision in its written employee policy manual to support such an argument.... In the Magistrate's view, Northern Telecom's decision to terminate Galbraith was due to her continued association with Hunter whom Northern Telecom no longer desired to employ. The presence of the two security officers who met Galbraith upon her return to work strongly suggests to the Magistrate that Northern Telecom's concern was that Galbraith's continued employment at Northern Telecom, coupled with her continued association with Hunter, whom Northern Telecom believed shot her, was simply unacceptable. *While there may have been legitimate business reasons for its concerns, Northern Telecom did not articulate those reasons or assign them as its reasons for Galbraith's termination.* Absent candor by the Northern Telecom officials who made this decision, the evidence of prior racial animosity to Galbraith from her association with Hunter, coupled with Galbraith's proof of the TDES Board of Review findings and the differences in her treatment from other employees in the administration of Northern Telecom's medical policy, create sufficient inferences [to establish] Galbraith's contention that she was fired because of her continued association with Hunter[,] who is black. There is no direct proof offered by the defendants to explain adequately the differences in treatment between Galbraith and other female employees who had repeated and excessive [absences] under the Northern Telecom medical leave policy, but were not discharged for such violations.

(Emphasis supplied).

The district court was required to accept these findings unless clearly erroneous. Fed.R.Civ.P. 53(e)(2) ("In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous."). In rejecting the report, the court held that the magistrate had misapprehended the second element of the *McDonnell Douglas* analysis. Relying on *Burdine*, the court correctly held that to meet this burden, Northern Telecom was merely required to "articulate a legitimate and nondiscriminatory reason for its actions, not to prove or persuade the Court that it was actually motivated by that reason." Therefore, the court continued, "the fact that a discharge decision may not be wise or the fact that a certain employer could have shown more leniency toward an employee in a particular situation is not within the realm of Title VII. Without a showing of discrimination, a bad decision to terminate an employee will not win a Title VII case." *See Jones v. Continental Corp.*, 789 F.2d 1225, 1233 (6th Cir.1986) ("In a disparate treatment case, the question before the court is not whether the employer *would have been* justified in firing the plaintiff for her conduct; the question is whether *in fact*, the plaintiff's firing was racially motivated.").

The district court concluded that the evidence of racial motivation for Galbraith's discharge was insufficient to hold Northern Telecom liable under Title VII. The court gave a number of reasons for reaching this conclusion. First, Galbraith's mistreatment by Taylor and others was too remote in time to permit an inference of racial motivation on the part of those who made the decision to terminate her. According to her own testimony, Galbraith had not experienced any harassment from her co-workers for the five months prior to her discharge. More importantly, when the incidents of racial harassment were made known to company officials, they promptly took strong action to correct the situation. *See Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250, 1253–56 (6th Cir. 1985) (company not responsible for creation of a hostile work environment under *respondeat superior* theory where management has taken prompt steps to relieve the hostile environment and incidents of racial harassment have been sporadic). Second,

the TDES report on which the magistrate relied was not entitled to the deference he gave it. The TDES Board is charged with determining whether employee misconduct has occurred, thereby justifying a denial of unemployment compensation. *See* Tenn. Code Ann. § 50–7–303(a)(2) (Michie 1983 & Supp.1990). The issue under Title VII is whether Galbraith's discharge was motivated by an unlawfully discriminatory intention. *Jones,* 789 F.2d at 1233. Third, there was no evidence, the court said, that Galbraith was treated differently from others who abused the company's medical leave policy. The employees to whom Galbraith compared herself were discharged for excessive casual absences, not for violating the medical leave policy.

According to the court, the fact that the other employees were ultimately discharged shows that they were treated similarly to Galbraith, not dissimilarly. *Cf. Shah v. General Electric Co.,* 816 F.2d 264, 270 (6th Cir.1987) (to establish a *prima facie* case of racial discrimination, plaintiff must show that other employees similarly situated but not members of a protected class were not subject to the adverse treatment complained of). In addition, because the other employees were not discharged for abuse of the medical leave policy, they were not similarly situated to Galbraith and may not be compared to her. *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 69 (6th Cir.1985) ("Different treatment does not constitute disparate treatment absent evidence of a disparate comparison to a similarly situated coworker or evidence supporting an allegation of illegitimate reasons for the employer's actions.").

### III

■ Before considering the issues within the prescribed legal framework, we think it best to clear the air by stating plainly what we believe has happened in this case. The magistrate concluded that Galbraith was discharged because Northern Telecom believed that Hunter had shot her and she was willing to continue her association with Hunter. Galbraith's complaint admits as much. To state her claim, Galbraith used a printed form. The tenth paragraph asks the plaintiff to state "[t]he circumstances under which defendant discriminated...." Galbraith answered this question by writing in her own hand:

> I personally don't know if this act should be classified as discrimination, race, or color. I do know that I have been terminated for a reason or reasons that are unjust or unfair. Personally I belive (sic) I was terminated because I was shot on company property & my assailant was identified as a black man, which I could not identify and company officials tried to coerce (sic) me to identify Mr. James Hunter who is a black man whom at one time I dated.

In short, Galbraith was discharged because of her association with Hunter's violence. It was not the interracial aspect of her association with Hunter that led to her dismissal, but its demonstrated propensity to erupt into violence threatening the safety and lives of Northern Telecom personnel.

■ The district court was bound to accept the magistrate's conclusions unless they are clearly erroneous. Fed.R.Civ.P. 53(e)(2); 28 U.S.C. § 636 (Magistrates Act); *Brown v. Wesley's Quaker Maid, Inc.,* 771 F.2d 952, 954 (6th Cir.1985). A finding is clearly erroneous where it is against the clear weight of the evidence or where the court is of the definite and firm conviction that a mistake has been made. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Johnson v. United States,* 600 F.2d 1218, 1222 (6th Cir.1979). When a district court has reviewed the findings of a magistrate under the proper standard, rejected them, and made findings of its own, we are likewise bound to accept them unless clearly erroneous. *See Stickler v. Pfister Assoc. Growers, Inc.,* 319 F.2d 788, 790 (6th Cir.1963) (appeals court bound to accept findings of district court unless clearly erroneous); *Haskell v. Washington Township,* 864 F.2d 1266, 1275 (6th Cir.1988). We review questions of law *de novo. See Burke v. United States,* 929 F.2d 1119, 1121 (6th Cir.1991).

We believe that the district court was correct in holding, as a matter of law, that the magistrate erred in concluding that the nondiscriminatory reason articulated by Northern Telecom was not "legitimate." The district court properly framed the issue raised by the second element of the *McDonnell Douglas* framework. A reason is legitimate for purposes of the civil rights laws if it is nondiscriminatory, even if it is mean-spirited, ill-considered, inconsistent with humane personnel policies, or otherwise objectionable. *See Jones*, 789 F.2d at 1233. Of course, if the employer's reasons are of such character, the trier of fact may consider them when it determines whether the reasons proffered were a pretext for racial discrimination. Nonetheless, at the second stage of the *McDonnell Douglas* inquiry, such considerations are immaterial.

It is apparent to us, as the magistrate found, that Galbraith's asserted violation of the company's medical leave policy was a pretext for the company's true motives in discharging Galbraith. The policy Galbraith allegedly violated shows every sign of being an *ad hoc* fabrication. As the magistrate informs us, there is nothing in Northern Telecom's rather elaborate written policies barring employees from taking personal leave after medical leave. We are given no reason for such a policy. We are instead asked to believe that Northern Telecom is so concerned with the integrity of its medical leave policy that it will dismiss after one violation an employee who has accumulated positive leave points through diligent attendance, while it is willing to tolerate repeated absences on the part of other employees for reasons far less compelling than the need to recuperate from potentially mortal wounds and the necessity of finding a baby-sitter on short notice in order to return to work.

For reasons we have given above, we disagree with the district court's opinion in so far as it implies that the reasons articulated by Northern Telecom were not pretextual or that Galbraith's employment was terminated because of abuse of the medical leave system. The "legitimate" reason proffered by Northern Telecom is clearly a pretext, and although it is "unworthy of belief," we do not believe that it is a pretext for racial discrimination.

Under Title VII, association with a violent person would be a legitimate reason for discharging Galbraith, because it is not motivated by racial considerations. Northern Telecom's treatment of Galbraith may have been harsh or callous, but that is not the concern of the federal courts under Title VII. Nor is it our business to inquire into the quantum of evidence tending to show that Hunter shot Galbraith. As long as this opinion is not a pretext for proscribed racial motivation, Northern Telecom cannot be faulted under the civil rights laws for acting on it.

These findings present us with an analytical problem because of the *McDonnell Douglas* standard for shifting of the burden of proof. The *McDonnell Douglas* allocation of evidentiary burdens is based on the assumption that discrimination is so pervasive in society that unless some nondiscriminatory reason can be articulated for the adverse treatment of a member of a protected class, discriminatory animus must be the cause. It follows, therefore, that where the purportedly legitimate reason is not the true reason for adverse treatment of an employee, unlawful discrimination is the likely cause. Hence, courts have said that an employee plaintiff may satisfy her burden under the third element of the *McDonnell Douglas* framework by showing that an employer's reasons are "unworthy of belief." The assumption behind this statement is the belief that if the reason proffered by the employer for the adverse treatment is a pretext, then it must be a pretext for racial discrimination.

In this case, the magistrate apparently believed that once Galbraith had demonstrated that abuse of the medical leave system was not the reason for her dismissal, no further inquiry was required and Galbraith was entitled to judgment, even if there was little other evidence of racial motivation. This view misapprehends the nature of the *McDonnell Douglas* doctrine. As *Burdine* teaches, the defendant's burden under the second element of *McDon-*

*nell Douglas* is a burden of production only. 450 U.S. at 254, 101 S.Ct. at 1094. The plaintiff's burden is one of production and persuasion throughout the case. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253, 101 S.Ct. at 1093. Although her burden is not onerous in the first phase of a disparate treatment case, a plaintiff must prove *by a preponderance of the evidence* her *prima facie* case. *Id.* at 253, 101 S.Ct. at 1094. In the third phase of the *McDonnell Douglas* framework, she must persuade the trier of fact that the proffered reason was pretextual, but this burden is simply a way of bearing her ultimate burden of showing that she has been the victim of intentional discrimination. *Id.* at 256, 101 S.Ct. at 1095.

Because of Northern Telecom's position in this case, we are faced with a situation in which proving that an employer's proffered reason for discharging an employee is a pretext does not establish that it is a pretext for racial discrimination. The alternative explanation, that she was discharged because she refused to prosecute Hunter and was believed to pose a continuing threat to the company because of her association with him despite his violence, is, as the magistrate found, far more compelling. We agree with the district court that under *Erebia*, Galbraith's harassment by a minority of her coworkers is not material to this case, because of the prompt remedial action Northern Telecom took when it learned of the matter. We also agree that the report of the TDES Board is entitled to little weight in a Title VII case because it is addressed to an issue not relevant to Title VII concerns. We must conclude, therefore, that the district court did not clearly err when it found that Galbraith had not proven by a preponderance of the evidence that she was the victim of intentional discrimination. Accordingly, the judgment below is AFFIRMED.

RALPH B. GUY, JR., Circuit Judge, concurring in result.

I concur in the result reached by the court, but disassociate myself from part III, which I feel involves impermissible factfinding at the appellate level. I am not sure why Northern Telecom discharged the plaintiff. I am convinced, however, that plaintiff failed to show that the reason given by the company was a mere pretext to mask racial animus.

This case was referred to a magistrate judge who, acting as a special master, heard all the evidence. The magistrate judge rejected the company's proffered reason for discharge and then jumped to the conclusion that this required a finding of pretext. In this, I believe, he was clearly erroneous. The plaintiff still must prove the purpose of the pretext was to hide an impermissible reason for discharge. The record is devoid of such proof.

GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge, dissenting.

I find myself at odds with the decision here for two reasons. First, the clearly erroneous standard of review governed the district court's analysis of the Magistrate's findings of fact in this case. *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1984); *Brown v. Wesley's Quaker Maid*, 771 F.2d 952 (6th Cir. 1985). The only real question before this court, then, is whether Judge Higgins properly reviewed the Magistrate's finding that the company's proffered reason for terminating the plaintiff was a pretext leading to a presumption of disparate treatment, and, an illegal discharge. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Beaven v. Commonwealth of Ky.*, 783 F.2d 672 (6th Cir.1985).

The burden was on the defendant in this instance, not the plaintiff, to show that their reason for termination was *legitimate and nondiscriminatory. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94. The Magistrate found the "voluntary termination" excuse "incredible" and Judge Higgins was obliged to defer to the findings on this issue of credibility. As the *Anderson* Court instructed:

"If the account of the evidence is plausible in light of the record viewed in its entirety, (the reviewing) court *may not reverse it* even though convinced that had it been sitting as the trier of fact it would have weighed the evidence differently. Where there are two permissible views of the evidence, *the factfinder's choice* between them *cannot be clearly erroneous.* 450 U.S. at 574 [105 S.Ct. at 1511–12]. (emphasis supplied). *See also, Wrenn v. Gould,* 808 F.2d 493 (6th Cir.1987); *Brown, supra.*"

Second, it is indeed ironic that, like the Magistrate, Judge Boggs finds the company's excuse for Ms. Galbraith's termination "unworthy of belief" which necessarily establishes the prima facie case of unlawful discrimination. *U.S. Postal Service Bd. of Gov. v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). As the *Aikens* court explained "the plaintiff ... may succeed ... *either* by directly persuading the court that a discriminatory reason more likely motivated the employer *or* indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 716, 103 S.Ct. at 1482 (*citing Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.) The plaintiff here chose the second method of proof and the magistrate concluded in his findings that the defendants committed an unlawful termination. Following the *Burdine* analysis, the defendant here had the burden of production to "clearly set forth, through the introduction of admissible evidence, *the reasons* for the plaintiff's" termination. *Burdine* at 255, 101 S.Ct. at 1094–95. Moreover, as the Court noted, "an articulation not admitted as evidence will not suffice." *Id.* at n. 9. In light of the defendant's insistence that the termination was based on their so-called "voluntary termination" policy deemed by the Magistrate and this court as "unworthy of belief," there is simply no legal justification to rule in their favor.

Yet, instead of affording the plaintiff her rightful remedy under the law, Judge Boggs supposes some other legitimate reason existed for the termination, one unrelated to racial discrimination. There is absolutely no admitted evidence of some other valid reason for the defendant's acts. In effect, then, this decision compounds error with error and in the process turns disparate treatment analysis on its head. In one breath he admonishes the company for its lack of candor, but, in the next implies that, despite the incredible nature of the explanation, the termination was somehow legitimate.

Judge Guy, in his concurrence, is troubled with these impermissible factual findings. I, instead, am distressed by the choice of a judicial tongue-lashing as the sole remedy for this aggrieved plaintiff. Once she established the pretextual presumption, Northern Telecom had the complete burden to demonstrate a *factually* legitimate reason for Ms. Galbraith's termination, not merely articulate a "sham" excuse. This is the essence of the Title VII pretext analysis. Because Northern Telecom clearly refused to do this, I would uphold the Magistrate that the defendant should be held fully liable under the remedial provisions of Title VII. Accordingly, I dissent.