**Sandra JURRUS, Plaintiff**

v.

**Anthony M. FRANK, Defendant.**

**No. 3:92CV7170.**

United States District Court, N.D. Ohio, Western Division.

March 30, 1993.

1994); No. 92–55974 1994 WL 6601, at *5 (9th Cir. Jan 10, 1994).

Harland M. Britz, Britz & Zemmelman, Toledo, OH, for plaintiff.

Suzanne H. Milton, United States Postal Service, Washington, DC, Holly Taft Sydlow, Office of U.S. Attorney, Toledo, OH, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN W. POTTER, Senior District Judge:

This cause was tried to the Court, pursuant to Title VII, 42 U.S.C. 2000e *et seq.* The trial was held July 26 and July 27, 1994. Plaintiff, a former postal employee, originally brought this suit against Anthony M. Frank, then the Postmaster General, and his successors alleging sexual discrimination and retaliatory discharge for prior Equal Employment Opportunity action.[1] In accordance with Fed.R.Civ.P. 52(a), the Court has considered and weighed all of the evidence and resolved any conflicts therein and now makes its independent findings of fact and conclusions of law. For reason of coherence, the Court has interspersed its conclusions of law with its findings of fact.

The plaintiff was hired by former Postmaster Joseph Smith at the Fostoria, Ohio post office in February, 1985. Plaintiff was hired as a part-time flexible clerk. Plaintiff's work hours were on an "as needed" basis. Plaintiff was terminated in June of 1990 for engaging in conduct unbecoming a postal employee.

The post office employs a "progressive discipline" system to effect employee discipline. The more disciplinary events a particular employee experiences, the more severe the discipline imposed. The ultimate and final disciplinary step in this system is termination. In most circumstances, a particular employee's past discipline record plays no part in determining whether or not a particular transgression is a punishable offense; rather, the progressive discipline system merely determines what the appropriate punishment is. Thus, two employees with different discipline records who commit the same offense will be punished differently, but both will be punished.

It is undisputed that plaintiff had a lengthy discipline record during her employment with the post office. It is also undisputed that plaintiff's next step in the progressive discipline system was termination.

Although the majority of plaintiff's prior discipline resulted from failure to satisfy attendance requirements, there were several noteworthy incidents involving insubordination or conduct unbecoming a postal employee. In one incident in 1986, plaintiff had a disagreement with a supervisor named Pankhurst. During the course of the dispute, plaintiff told the supervisor that he had "no brains," called him a "wimp," and threatened to "get" his "ass." In another incident in 1988, plaintiff told another supervisor, Frank Haubert, that he was "sick," "mentally incompetent," a "pervert" and an "asshole." Both of these incidents resulted in plaintiff receiving a fourteen day suspension.

As stated, despite these memorable events, the majority of plaintiff's discipline resulted from her use of sick leave.[2] While plaintiff's use of sick leave never exceeded the amount she earned, she took it in a pattern such that plaintiff would be absent either at the beginning or end of her work week, effectively giving her extended weekends. Due to this pattern of behavior, plaintiff had received two fourteen day suspensions by the end of January, 1990.[3]

When plaintiff received her second suspension on January 17, 1990, she received the following letter:

A review of your attendance record from 7–31–89 to the present indicates that you have been absent from your official duties

---

1. Plaintiff's jury demand was stricken, and plaintiff's claim for punitive damages was dismissed by this Court's Order of September 25, 1993.

2. Plaintiff was also AWOL on June 3, 1989 at the time of her daughter's graduation. Plaintiff also took sick leave on June 2 and June 5, 1989. June 4, 1989 was a Sunday.

3. The Court notes that plaintiff was never forced to serve these suspensions because of the financial hardship they would have created. Rather, they were "paper" suspensions, and were documented in her record for the purposes of progressive discipline.

on unscheduled absences on the following occasions:

| DATE | TYPE OF LEAVE |
|------|---------------|
| 1–5–90—1–8–90 | 24 hours sick leave |
| 12–18–89 | 8 hours sick leave |
| 11–28–89 | 8 hours sick leave |
| 10–30–89 | 8 hours sick leave |
| 10–09–89 | 8 hours sick leave |
| 07–31–89 | 8 hours sick leave |

Regular attendance is a requirement of your position. Further instances of this nature will not be tolerated. In addition, the following elements of your past record have been considered in arriving at this action: fourteen (14) days suspension for absence Without official Leave/Failure to Satisfactorily Maintain Work Schedule on 6–26–89; Ten (10) days suspension for Insubordination on 1–26–89; Five (5) days suspension for Insubordination on 11–4–88; and Letter of Warning for Insubordination on 9–1–88.

In view of your past record, more severe disciplinary action could be justified and may be expected in the event additional disciplinary action becomes necessary.

Plaintiff presented evidence that, at the time of the absences, she was being treated for severe depression, which would be most debilitating at the beginning or end of a week. Postmaster Smith testified that when plaintiff was off for her weekend sickness her telephone was not answered, and when employees were sent to her home she did not answer the door.

Plaintiff was very familiar with her EEO rights and her grievance rights under her employment contract. For virtually every instance of discipline she received, plaintiff filed both an EEO complaint and a union grievance. None of these complaints were found to have merit. Plaintiff filed both an EEO complaint and a grievance regarding the 17 January, 1990 suspension. The grievance resulted in a neutral arbitrator finding the suspension was for "just cause." The EEO complaint resulted in a decision of "no discrimination."

The Fostoria post office is a very small operation. There are approximately twenty people employed there. Roughly half of the employees are male, and half female. Because of the small number of employees, unexpected absences created major difficulties in the efficient processing of the mail. The office is also small enough that the supervisors often share their responsibilities when short handed. The mail carriers, when finished with their routes, often helped the clerks in the performance of the clerks' jobs.

Postmaster Smith took an active part in grooming his workers, both male and female, for promotion within the ranks of the Post Office. He encouraged them to apply for promotions, and often saw his better employees, male and female, promoted to the position of Postmaster of other offices.

Plaintiff is a very assertive and aggressive individual. Plaintiff was also, on occasion, aggressive to the point of being combative, and several of her coworkers feared her combative nature and temper. Plaintiff was also quick to find fault with her co-workers, and quick to bring these perceived shortcomings to the attention of her supervisors.

Within a year of her hire, plaintiff was elected as the local steward of the American Postworkers Union. Plaintiff was later elected president of the union local. Plaintiff was the first female union official in the Fostoria post office. Postmaster Smith initially had some difficulties dealing with plaintiff as the union steward. These difficulties did not stem from plaintiff's gender, but because plaintiff was aggressive to the point of being combative, and assertive to the point of abrasiveness.

Many of the employees at the Fostoria post office employed a rather varied and colorful, and often profane, lexicon. In response to this situation. Smith posted the following letter in January of 1986:

All Employees:

I hear more and more profanity on the work room floor. I do not believe it is necessary to use profanity or four letter syllables when talking to someone or expressing your views.

If anyone can'not [sic] speak without using profanity or vulgar expressions then I would suggest that you keep your thoughts to yourself. If anyone has a problem with the above, please stop in my office.

On April 3, 1990, plaintiff became involved in a dispute with a co-worker named Sue Hill. Hill was disgruntled because she had recently been passed over for a promotion. During the course of the dispute, Hill became abusive towards plaintiff. Plaintiff immediately went to Postmaster Smith's office in tears to complain of Hill's behavior. Smith could not locate a witness to this altercation and, as Hill disputed plaintiff's version of the event, did not assess blame as the facts could not be determined.

On April 23, 1990, the plaintiff ate strawberries and sauerkraut for lunch.[4] Plaintiff then clocked-in, returned to work and opened her window. Plaintiff soon had to close her window and answer an urgent call of nature. Plaintiff went back to the locker room and was in the rest room for ten to fifteen minutes.

Plaintiff's direct supervisor was Terry Robinson. Robinson noted plaintiff's rather abrupt trip to the rest room and began timing plaintiff. Plaintiff exited the rest room to find Robinson waiting outside the door for her, tapping his foot and staring at his watch. Robinson asked plaintiff if "everything was alright," and wanted to know why plaintiff took so long and what was she doing. An argument ensued. Both plaintiff and Robinson shook their index finger in the other's face. Eventually, plaintiff told Robinson that "If you really have to know, I was taking a f——ing s——." Plaintiff also stated that "You [Robinson] never say a f——ing thing when anyone else does anything around here except Beth [a co-worker] and I."[5] The argument continued for three or four minutes thereafter. While the volume of the argument was a little above conversational, neither other postal workers nor customers heard the confrontation. The altercation was, however, observed visually by two employees.

The Court finds that Robinson never used profanity during the exchange and, in fact, was never heard to use profanity in the workplace.

The "sauerkraut and strawberries" incident was not disruptive to the working environment of the post office as it existed at that time. Postmaster Smith, however, testified that, while the incident was not actually disruptive, it "could have been."

Plaintiff was ultimately written-up by Robinson for this incident. The Hill incident was listed in the write up but was not a factor in the discipline. The discipline and discharge was approved by Postmaster Smith. Specifically, plaintiff was disciplined for "conduct unbecoming" a postal employee, a violation of Section 666.2 and 666.51 of the USPS Standards of Conduct.[6] Postmaster Smith testified that, with respect to this type of violation, there is no discretion whether or not the offender is disciplined.

The following past discipline incidents were considered in arriving at the decision to terminate plaintiff's employment:

1) the Sept. 1, 1988 letter of warning for insubordination;

2) the November 4, 1988 5–day suspension for insubordination;

3) the January 26, 1989 10–day suspension for insubordination;

4) the June 26, 1989 14–day suspension for absences without leave;

5) the January 18, 1990 14–day suspension for absences without leave.

Plaintiff grieved her discharge and alleged discrimination. A hearing on the grievance was held on December 11, 1990 by a neutral arbitrator. The grievance was denied in a lengthy written opinion on January 25, 1991.

Plaintiff also filed an EEO complaint alleging sex discrimination on August 24, 1990. A

---

**4.** Plaintiff was on a weight-watchers diet.

**5.** The uncensored language may be found in the record.

**6.** Section 666.2 reads, in pertinent part: "Employees are expected to conduct themselves during ... working hours in a manner which reflects favorably on the Postal Service.... Employees are expected to maintain satisfactory personal habits so as not to be obnoxious or offensive to other persons or to create unpleasant working conditions."

Section 666.51 reads, in pertinent part: "Employees must obey the instructions of their supervisors. If an employee has reason to question the propriety of a supervisor's order, the individual will nevertheless carry out the order...."

hearing was held and the EEO administrative judge issued a recommended decision of no discrimination, which was adopted by the Postal Service.

After her discharge, plaintiff worked at several jobs, but was unable to find employment comparable in pay to her job in the Postal Service. As a result of this, plaintiff began attending college and eventually obtained a degree in radiation therapy. Plaintiff has since found employment in this field. This case was bifurcated as to liability and damages.

A letter carrier by the name of William Bintz was also employed in the Fostoria post office. As a clerk, plaintiff was directly supervised by Robinson, while the carriers were supervised by Frank Haubert. Nevertheless, Haubert and Robinson occasionally shared their supervisory responsibilities, and both were answerable and reported to Postmaster Smith.

Bintz frequently used profanity on the workroom floor in the presence of supervisory personnel. Several witnesses testified that Bintz had several profane outbursts during the period of plaintiff's employment, and in at least two of these incidents the profanity was used in the presence of and directed at Robinson or Smith.

In one incident, there apparently was an error in Bintz's paycheck, causing him to not receive payment for overtime worked. When Bintz discovered this he turned to the supervisor's desk, where Robinson was seated, and began shouting his frustration. Bintz used the terms "god-damn son of a bitch" and "f——." It is undisputed that Bintz was loud, and the incident was witnessed and heard by employees on the workroom floor. Robinson testified that Bintz quickly calmed down after Robinson promised to rectify the error. Robinson also testified that, even though Bintz was looking at and shouting at the supervisor's desk where Robinson was seated, Bintz was not directing his outburst at Robinson.

In the other relevant incident, a UPS parcel was inadvertently dropped off at the post office by a customer on Bintz's route. Bintz was directed to return the parcel to the customer while making his rounds. Bintz hurled the parcel at the supervisor's desk, where Postmaster Smith was seated, indicated loudly that he was not going to deliver the parcel, and told the Postmaster that he "wasn't taking that f——ing thing back for nobody." The outburst also included the expletives "f—" and "god-damn." There were several witnesses who both heard and saw this incident as well.

Bintz was not disciplined for either of these incidents. Robinson stated as to the paycheck incident that whereas Jurrus directed her outburst at him, Bintz did not. The fact that Haubert was Bintz's direct supervisor is irrelevant in this instance; the outburst was ostensibly directed at Robinson, and Robinson could have disciplined Bintz for it.

■■ The Court finds that, with respect to the parcel incident, the Postmaster took Bintz aside and gave him an informal lecture; no formal discipline was ever imposed. The fact that Smith was Bintz's target rather than Robinson is also irrelevant in this instance; the profanity was directed at the man who approved plaintiff's punishment for her infraction. Thus, the Court, at the time of trial and now, finds disparate treatment sufficient to support the finding of a prima facie case. The finding of a prima facie case requires a lesser degree of proof than a finding of intentional discrimination based on gender. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 514–15, 113 S.Ct. 2742, 2751, 125 L.Ed.2d 407 (1993).

This case arises under 42 U.S.C. § 2000e, which makes it unlawful for an employer to discharge an individual based upon her gender. In this case, plaintiff is effectively arguing that it was the fact that she was disciplined for behavior that similarly situated males engaged in and escaped discipline that constitutes the discrimination.

■■ As this is a disparate treatment case, plaintiff had to establish that an adverse employment action was taken against her under circumstances sufficient to create an inference of intentional unlawful discrimination. *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

Plaintiff must carry the initial burden by showing

a) she belongs to a protected class;

b) she was disciplined for violating a post office policy;

c) that non-minority, similarly situated employees were not disciplined or were treated better for the same or similar conduct.

See *Davis v. Monsanto Chemical Co.*, 858 F.2d 345, 347–48 (6th Cir.1988); *Beaven v. Commonwealth of Kentucky*, 783 F.2d 672, 675 (6th Cir.1986); *McGee v. Genesco, Inc.*, 14 F.3d 601, 1994 WL 4721 (6th Cir.Table 1994). *See also Mitchell v. Toledo Hospital*, 964 F.2d 577, 5832 (6th Cir.1992). It is undisputed that plaintiff belongs to a protected class and that she was disciplined for her use of profanity towards Robinson. The Court must then turn its attention to the third prong of the inquiry.

Plaintiff's prima facie case rises or falls upon whether she and Bintz were similarly situated for the purposes of imposing discipline for similar profane outbursts.[7] The Court finds that they were.

The Court first notes that it is irrelevant that plaintiff was ultimately discharged and that Bintz was not. Plaintiff had more progressive discipline than Bintz, thus her discharge was the appropriate next step in the "progressive discipline" ladder. In this regard, Bintz and plaintiff are not similarly situated, but for the purposes of finding a prima facie case, this distinction is immaterial.

The Court finds that Bintz was not disciplined for use of profanity in circumstances that were sufficiently similar to plaintiff's so as to raise an inference of discrimination. Both individuals used profanity in the presence of the same superiors, both used profanity in violation of Postmaster Smith's rule, and both engaged in conduct that is unbecoming of a postal worker. One was disciplined, and the other was not.

<span>■</span> Plaintiff has, therefore, established a prima facie case of disparate treatment based upon gender. The burden of production now shifts to defendant to come forward with evidence of a legitimate reason for the disparate treatment. *See Hicks*, 509 U.S. at 507–11, 113 S.Ct. at 2747–49. If defendant carries the burden of production, the *McDonnel Douglas* framework becomes irrelevant and the issue of intentional discrimination becomes one for the trier of fact. *Id.* at 511, 113 S.Ct. at 2749.

Plaintiff, in substance, has presented a "pretext only" case. The Sixth Circuit, prior to *Hicks*, has been a "pretext plus" circuit. *See, Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078 (6th Cir.1994). Further, in *Manzer*, the court said the following:

To make a submissible case on the credibility of his employer's explanation, the plaintiff is "required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir.1993) (emphasis added and quotation marks omitted). The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are "factually false." *[Anderson v.] Baxter Healthcare [Corp.,]* 13 F.3d [1120] at 1123–24 [7th Cir.1994]. The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. These two types of rebuttals are direct attacks on the credibility of the employers' proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed "a suspicion of mendacity." *Hicks*, 509 U.S. at 511, 113

---

**7.** The Court observes that plaintiff may have initially tried to argue that the discipline imposed upon her for excessive absenteeism was discriminatory as well. Plaintiff appears to have abandoned this argument by the time of trial, however, as she presented no evidence of similarly situated employees who were disciplined differently for comparable episodes of absenteeism.

S.Ct. at 2749. As *Hicks* teaches, such a showing permits, but does not require, the factfinder to infer illegal discrimination for the plaintiff's prima facie case.

*Id.* At 1084.

■ Defendant met its burden of production by providing evidence that plaintiff was legitimately disciplined for insubordination. Defendant contended that Bintz and plaintiff were not similarly situated and that their use of profanity is distinguishable. Defendant primarily relied on the fact that plaintiff and Bintz had different jobs and different supervisors. Defendant also argued that plaintiff swore directly at Robinson in defiance of his authority, whereas Bintz swore at situations vice individuals. Both of these reasons are sufficient to meet defendants burden of production. *See Manzer*, 29 F.3d at 1082.

Defendant also put forth the decision of the neutral arbitrator and that of the EEOC who both upheld plaintiff's discharge as evidence that defendant had a legitimate, non-discriminatory reason for plaintiff's discharge. *See Jasany v. U.S. Postal Service*, 755 F.2d 1244, 1252 (6th Cir.1985). The defendant is correct in stating that such a decision is evidence that the Court may consider; however, the Court is not bound by the arbitrator's or the EEOC's decision. They were, however, also sufficient to meet the defendant's burden of production in this instance.

Under the *Hicks* analysis, plaintiff now must present rebuttal evidence in order to meet plaintiff's ultimate burden of proving intentional discrimination. One method of doing this is by showing that defendant's proffered legitimate reason for the adverse employment action was, in fact, a pretext; that is, a statement that does not describe the actual reasons motivating the adverse action. 509 U.S. at 508–11, 113 S.Ct. at 2748–49.

■ In this instance, plaintiff came forward with evidence establishing that plaintiff's and Bintz's behavior were virtually indistinguishable and that Bintz's conduct was equally as insubordinate as plaintiff's. The Court therefore turns its analysis to the behavior and employment status of the two individuals.

The Sixth Circuit has definitively addressed what constitutes "similarly situated" individuals in a Title VII disparate treatment analysis:

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly situated in all respects. Thus, to be deemed "similarly situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have *dealt with* the same supervisor, must have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell*, 964 F.2d at 583 (emphasis added). The "comparables" need not hold the exact same jobs; however, the duties, responsibilities and applicable standards of conduct must be sufficiently similar in all relevant aspects so as to render them comparable. *Id.* at 583, fn. 5.

Applying the above criteria to the case at bar, the Court holds that, for the purposes of establishing disparate treatment, plaintiff and Bintz were similarly situated in all relevant aspects of their jobs. While they had different direct supervisors, both dealt with the same supervisors, Smith and Robinson, during the above-described "profanity incidents." The Court finds, however, that the similarity between plaintiff and Bintz ended with the incidents of profanity.

■ The Court finds plaintiff had the worst attendance record of any employee and the worst record for insubordination. The Court finds these reasons are not pretext. The Court does not review business judgments and, if a decision is nondiscriminatory even if it is mean spirited or otherwise objectionable, the conduct does not violate Title VII. *See Galbraith v. Northern Telecom, Inc.*, 944 F.2d 275 (6th Cir.1991). Even if defendant's reasons for the disparate treatment were pretextual, this does not mandate a finding in favor of the plaintiff. *Hicks*, 509

U.S. at 508–11, 113 S.Ct. at 2748–49. Plaintiff must prove both that the proffered reasons for the challenged conduct are pretextual and that the animus behind the challenged action was intentional discrimination. *Id.* at 519–21, 113 S.Ct. at 2754 ("It is not enough, in other words, to *dis*believe the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination."). *See also, Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 804 (6th Cir.1991). While under some circumstances, the fact finder may, from the prima facie case and the finding of pretext, infer a discriminatory animus, such a finding is not required as a matter of law. *Id.* at 511, 113 S.Ct. at 1749.

The ultimate determination of intentional discrimination, then, is for the fact finder. All the evidence that the Court needs to decide the issue of whether or not the defendant intentionally discriminated against plaintiff is before the Court. The Court must weigh this evidence, mindful that the ultimate burden of persuasion rests at all times with plaintiff, and determine whether plaintiff's gender was the motivating factor in defendant's treatment of her. *United States Postal Service v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). In this case, the Court finds that plaintiff's gender played no role in her discipline and discharge.

Even though Bintz and plaintiff were similarly situated for the purposes of a Title VII comparison, particularly with respect to the questioned conduct, the Court finds that plaintiff's prior work history to be the more likely reason for the disparate treatment. Different treatment is a Title VII violation only if gender was a motivating factor in its exercise. The Court finds that it was not. There was no direct evidence of gender discrimination.

The undisputed evidence before the Court demonstrates that plaintiff had a horrendous work record at the Fostoria post office. She was frequently absent without leave and frequently insubordinate. There was also testimony that plaintiff was a troublemaker who was often disruptive to her work environment, quick to find fault with and complain about her co-workers, and that some of plaintiff's co-workers feared plaintiff for her combative nature and quick temper. There is no evidence that Bintz, although coarse and vulgar, had a similar track record. The Court finds that no other female employees were treated differently on account of their gender. In fact, the evidence reveals that Smith actively groomed his employees, without respect to gender, for promotion within the post office, and was successful in seeing several of his male and female employees promoted to the position of Postmaster of other offices. The decisions of the EEO investigation and the neutral arbitrator also, although not binding on the Court, constitute evidence that plaintiff was not discriminated against on account of gender.

The Court finds that plaintiff has failed to meet her burden of proving that her gender was a motivating factor in her disparate treatment. The Court finds that defendant did not intentionally discriminate against plaintiff on account of her gender and that plaintiff's gender played no part in her discipline.

Plaintiff has also alleged that defendant discharged her in retaliation for her prior protected EEO activities. In order to establish a prima facie case of retaliation, plaintiff must show:

a) that she engaged in protected activity;

b) defendant knew that she engaged in this activity;

c) defendant subsequently made an adverse employment decision regarding plaintiff; and

d) that there is a causal link between plaintiff's protected activity and the adverse employment decision.

*Canitia v. Yellow Freight System, Inc.,* 903 F.2d 1064, 1066 (6th Cir.1990). It appears that plaintiff may have abandoned this case at trial as well but, nevertheless, the Court will address it on the merits. The Court holds that plaintiff has failed to adduce any evidence that would establish a causal link between her protected activity and the actions taken against her. Plaintiff has, therefore, failed to establish a prima facie case, and the Court finds in favor of defendant on this claim.

*Summary of Findings of Fact
and Conclusions of Law*

1. Plaintiff, as a woman, was a member of a protected class.

2. Plaintiff was disciplined for behavior that violated the Post Office's Standards of Conduct. Plaintiff engaged in conduct unbecoming a postal worker.

3. A male co-worker of plaintiff's, Bill Bintz, was not disciplined for similar profanity infractions with the same supervisors. In this regard, Bintz also engaged in conduct unbecoming a postal worker, but escaped discipline.

4. Under the circumstances re profanity, plaintiff and Bintz were similarly situated.

5. Plaintiff's gender was not a motivating or determinative factor in this differential treatment.

6. Defendants did not intentionally discriminate against plaintiff on account of her gender.

7. Plaintiff has failed to present evidence that she was disciplined in retaliation for her EEO activity.

THEREFORE, for the foregoing reasons, good cause appearing, it is

ORDERED that judgment be, and hereby is, entered in favor of the defendant on plaintiff's Title VII gender discrimination claim; and it is

FURTHER ORDERED that judgment be entered in favor of the defendant on plaintiff's Title VII retaliation claim.