28 F.3d 1213
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant,
v.
SHONEY'S, INC., d/b/a Fifth Quarter Restaurants, Defendant-Appellee.
 No. 93-5583.
 United States Court of Appeals, Sixth Circuit.
 July 5, 1994.
As Amended Aug. 18, 1994.
 
 Before: MERRITT, KENNEDY and NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 The Equal Employment Opportunity Commission ("EEOC" or the "Commission") appeals the award of attorneys' fees to defendant Shoney's, Inc., d/b/a Fifth Quarter Restaurants ("Shoney's") for filing a discrimination charge the District Court found to be without merit. The EEOC filed a Title VII, 42 U.S.C. Sec. 2000e, et seq., complaint against Shoney's on behalf of Faheem S. Bengazi alleging that Shoney's suspended and discharged Bengazi because of his perceived national origin and race. The EEOC contends that after it filed suit, it discovered its charges against Shoney's were without merit. To its credit, the EEOC then swiftly moved to dismiss the complaint with prejudice. The District Court dismissed the action with prejudice and, on Shoney's motion, awarded attorneys' fees on the grounds that the suit was unreasonable and meritless from the outset. The amount of fees and costs to Shoney's was stipulated and the EEOC appeals only the court's order granting the award of attorneys' fees.
 
 I.
 
 2
 Beginning in October 1987, Bengazi worked as a busperson and then as a "salad runner" at the Fifth Quarter Restaurant, a Shoney's-owned restaurant in Chattanooga, Tennessee. On October 12, 1987, Bengazi filled out and signed an I-9 Employee Information and Verification form as required by the Immigration Reform and Control Act of 1986 ("IRCA" or the "Act"), 8 U.S.C. Sec. 1324(b). Under the Act, an employer must certify that all of its employees are eligible for employment in the United States. Certification requires proof of identity and proof of employment eligibility. Bengazi produced his social security card, which established work eligibility, but did not produce a document to establish identity, such as a driver's license.[1]
 
 
 3
 Shoney's management at the Fifth Quarter was lax in their compliance with the IRCA I-9 requirements at the time Bengazi was hired. In August 1988, however, management stepped up its compliance efforts and reviewed employee files searching for incomplete I-9 forms. Bengazi was among those employees who had not submitted all required documentation. On August 26, 1988, Bengazi was told by David Emery, the assistant manager, that he would have to submit proof of identity with a driver's license or birth certificate or face suspension. Emery's instructions were partially in error since a birth certificate establishes work eligibility and not identity. Bengazi was immediately suspended, but was told that he would be reinstated as soon as he produced the requested documentation or proof that he was in the process of obtaining it. On September 25, 1988, Bengazi was discharged for failing to present the required documentation.
 
 
 4
 Between suspension and discharge, Bengazi applied for unemployment compensation. The Tennessee Department of Employment Security denied his claim and Bengazi appealed. An appeal hearing was held on October 20, 1988, at which Emery appeared on behalf of Shoney's. Emery testified that Bengazi was fired for his failure to produce a birth certificate or picture identification. Joint App. at 337. Bengazi testified that he had not obtained his birth certificate because he had no money. It was established that Bengazi understood that he would be reinstated if he brought in one of the requested documents.
 
 
 5
 The next action Bengazi took was to file a complaint with the Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices ("OSC"), pursuant to IRCA for discrimination based upon citizenship and national origin. This misstep sent this case down the wrong path where it traveled until dismissal. We characterize this as a misstep because Bengazi is and always has been a United States citizen.[2] He was born in Chicago, Illinois as Stephen Kenneth Surgick. After converting to the Muslim faith, Surgick legally changed his name to Faheem Siddiq Bengazi in 1979. In the course of its investigation, OSC received a copy of Bengazi's I-9 form. Bengazi completed the section of the form entitled "Birth Name" by entering "Stephen Kenneth Surgick." This part of the form, however, had not been photocopied and did not appear on the copy of the form sent to OSC by Shoney's.
 
 
 6
 An OSC attorney notified Bengazi that Shoney's was willing to rehire him if he could bring in the proper documentation. OSC used records provided by Shoney's as comparative evidence to determine whether Bengazi had been discriminated against. After taking into account the fact that Shoney's did not begin enforcing the I-9 requirements in earnest until August 1988, OSC identified four employees who were delinquent in their compliance, but were allowed to work after Bengazi's suspension. Subsequently, OSC dismissed the citizenship claim and referred the national origin claim, along with its investigative file, to the EEOC office in Memphis.
 
 
 7
 After reviewing the OSC file, the EEOC prepared a charge on behalf of Bengazi alleging that his suspension and termination were the result of sex and national origin discrimination. Bengazi signed and returned the charge on February 20, 1989. On March 29, 1989, the case was then assigned to Lucille Kephart, an EEOC investigator based in Nashville. Based upon Kephart's recommendation, the EEOC issued a reasonable cause determination. It found that Bengazi was the first and only employee to be severely disciplined, i.e., suspended, and discharged for failing to produce complete I-9 documentation. While recognizing that Bengazi had not charged race discrimination, the EEOC believed that Bengazi had been treated differently because of his race, black, and because of "his perceived national origin/Arab (i.e. foreign name--Faheem Siddiq Bengazi." Joint App. at 347. The EEOC determined that it had no cause to believe that Bengazi had been discriminated against on the basis of his sex.
 
 
 8
 Conciliation failed. Subsequently, on October 1, 1990, the EEOC filed a Title VII complaint against Shoney's alleging discrimination on the basis of national origin and race. After a period of discovery, the EEOC learned that Shoney's knew of Bengazi's birth name and that he was born in Chicago at the time of his suspension. It also determined that the comparables previously identified were not treated so differently so as to support any claim of discrimination. Consequently, the EEOC filed a motion to dismiss the complaint with prejudice because it no longer believed a viable claim existed. The District Court dismissed the case with prejudice and granted Shoney's motion for attorneys' fees under Title VII.
 
 II.
 
 9
 The decision whether to award attorneys' fees to a prevailing defendant in a Title VII action is left to the discretion of the District Court. Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421 (1978). "In sum, a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." Id. at 421. When reviewing a decision to award fees, our task is to determine whether the District Court abused its discretion in making the award. Tarter v. Raybuck, 742 F.2d 977, 985-86 (6th Cir.1984) (abuse of discretion standard, which applies in Title VII cases, also applies to 42 U.S.C. Secs. 1983, 1988 cases), cert. denied, 470 U.S. 1051 (1985). In our review, we are careful not "to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." Christiansburg, 434 U.S. at 421-22. The purpose of the availability of an award of fees to prevailing defendants is "to protect defendants from burdensome litigation having no legal or factual basis." Id. at 420.
 
 
 10
 The District Court began its inquiry by asking whether at the time it filed suit, the EEOC had enough evidence to make out a prima facie case of race or national origin discrimination.
 
 
 11
 [T]he determinative question underlying any finding that the plaintiff's action was either frivolous, unreasonable or groundless under the Christiansburg standard, therefore, is whether the EEOC possessed enough comparative evidence at the time it filed suit against Shoney's to create a reasonable inference Faheem S. Bengazi had been treated differently than similarly situated individuals because of his race and perceived national origin.
 
 
 12
 Joint App. at 392.
 
 
 13
 While this is a very close question, we conclude that the District Court abused its discretion in awarding attorneys' fees to Shoney's. If this case involved only a charge of national origin discrimination, we would affirm the judgment of the District Court. However, it appears that at the time it filed suit, the EEOC had a basis for its conclusion that Bengazi had a colorable claim for race discrimination.
 
 A.
 
 14
 At the time the EEOC filed its complaint, it knew that Bengazi was a United States citizen formerly named Stephen Kenneth Surgick. Its national origin claim rested on the assumption that despite these facts Shoney's perceived Bengazi to be of some foreign national origin because of his foreign-sounding name. This theory was based on the questionable reasoning of EEOC investigator Kephart. She testified that even if Shoney's knew that Bengazi was a United States citizen who had changed his name, it wouldn't have changed her determination that Shoney's may have discriminated against him because of his perceived foreign national origin. Joint App. at 107-14. She believed that it was enough if Shoney's associated Bengazi with a foreign group, that he himself need not be foreign born. Kephart testified that she associated well-known Americans with Muslim names with a foreign national origin, even though she knew they were born in the United States with non-Muslim names. She believed Muslim names were "un-American" or "non-American" because they are associated with a Muslim group.[3] Joint App. at 110. She also explained that she associated Bengazi's Muslim name with national origin as opposed to religion in part because this was an "I-9 case." Kephart had no basis for concluding that Shoney's shared her strange perception of Muslim names.
 
 
 15
 As counsel for Shoney's elicited during Kephart's deposition, given that Bengazi's national origin is the United States, the national origin claim depended upon Shoney's perception of Bengazi's origin. Kephart admitted that after her investigation into the matter, she had no idea whether Shoney's knew of Bengazi's true origin, yet she still found reasonable cause to believe that Shoney's perceived Bengazi to be of a foreign national origin. We agree with the District Court's conclusion that as to the national origin claim, the EEOC's investigation was grossly inadequate.[4] Kephart could not recall whether she had asked Shoney's whether it knew of Bengazi's birth name and birthplace at the time of Bengazi's suspension. Indeed, there was nothing in the investigative file indicating that Kephart had made this inquiry of Shoney's. Bengazi testified that he had told her that Shoney's knew of his background. It strains reason that Shoney's would not know the national origin of someone who had worked there for several months. Further, the EEOC never requested a good copy of Bengazi's I-9 form, which would have established Shoney's knowledge of Bengazi's national origin. Once the EEOC received a good copy, it determined that its national origin claim lacked merit.
 
 B. Race
 
 16
 We believe, however, that the EEOC did have some grounds to file a race-based charge against Shoney's. While the original EEOC charge did not include race as a purported reason for Bengazi's apparently different treatment, the EEOC's complaint did not go beyond the scope of the EEOC investigation reasonably expected to grow out of the charge. See EEOC v. Bailey Co., Inc., 563 F.2d 439, 446 (6th Cir.1977) ("The clearly stated rule in this Circuit is that the EEOC's complaint is 'limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination.' ") (quoting Tipler v. E.I. duPont deNemours & Co., 443 F.2d 125, 131 (6th Cir.1971)), cert. denied, 435 U.S. 915 (1978). During the process of identifying comparables, Kephart noticed that certain white employees with incomplete I-9 forms had not been suspended immediately as had Bengazi, who is black. The EEOC identified four white employees who were able to work with incomplete I-9 forms around the time of Bengazi's suspension: Theresa McPhail, Rebecca Ervin, James Rodgers, and Bert Ingram.
 
 
 17
 On appeal, the EEOC no longer presents McPhail as a comparable. As for Ervin, she was asked to bring in and did bring in a social security card and a birth certificate, the same documents requested of Bengazi. Joint App. at 145. Technically, Ervin's I-9 form was incomplete; she produced two documents establishing work eligibility and nothing to establish her identity. She was not, however, treated differently from Bengazi, who had similarly been erroneously told to bring in a birth certificate, a second eligibility document. Ervin, therefore, cannot serve as a comparable.
 
 
 18
 Rodgers cannot serve as a comparable either. Rodgers was hired in February of 1988 and fired in October of 1988. According to payroll records for June and September of 1988, Rodgers was not working during the relevant time period, i.e., when Shoney's began enforcing the I-9 requirements in earnest in August. While Rodgers appeared on an employee list for September and was not fired until October, we believe that it was unreasonable to assume that Rodgers was working when he did not appear on the payroll.
 
 
 19
 Finally, there is Ingram. There are two I-9 forms in the record for Ingram, one dated August 22, 1988 and the other dated August 28, 1988. Joint App. at 25, 353. The first indicates that Ingram presented only his social security card number. The second indicates that he presented both a social security card number and a birth certificate. According to payroll records, Ingram was hired on August 28, 1988. Ingram was fired on October 2, 1988 for "deliberate unsatisfactory work behavior." Shoney's contends that the EEOC had Ingram's August 28th I-9 form at the time it filed suit; the EEOC contends that it had only the August 22nd form in its possession at that time. The record supports the EEOC's contention; Kephart's recommendation, the EEOC determination and Kephart's deposition testimony are all based on Ingram's I-9 form indicating that he presented his social security card number alone.
 
 
 20
 Thus, it appeared that Bengazi, a black employee with an incomplete I-9, had been immediately suspended for his non-compliance, whereas Ingram, a white employee with an incomplete I-9, had been allowed to work for a few weeks. We find that the EEOC could reasonably conclude that Ingram was similarly situated to Bengazi. While it is true Bengazi had been working for approximately ten months in technical non-compliance before he was suspended, Shoney's did not begin its I-9 enforcement policy until August of 1988, thus, those ten months could be excluded from this inquiry. As Ingram remains as a viable comparable, we conclude that this is enough to establish a prima facie case of disparate treatment. Cf. Rowe v. Cleveland Pneumatic Co., 690 F.2d 88, 96 (6th Cir.1982) (proof that at least one white applicant who was less qualified than black plaintiff was hired enough to establish prima facie case of disparate treatment). Since there was "some foundation" for believing that Bengazi was discriminated against because of his race, the court's award of attorneys' fees was improper. In re Ruben, 825 F.2d 977, 987 (6th Cir.1987), cert. denied, 485 U.S. 934 (1988); see also, Tarter, 742 F.2d at 987-88 (reversing award of attorneys' fees where one of plaintiff's claims was not meritless, even though another claim was patently without merit).
 
 
 21
 We note that Shoney's may be said to share some of the blame for this suit proceeding as it did. At no time did Shoney's offer a clear explanation as to why Bengazi was immediately suspended from his job. Shoney's offered contradictory descriptions of the facts leading up to and surrounding the suspension. First, in a letter to the OSC dated January 26, 1989, counsel for Shoney's represented that Bengazi and four other employees had been notified on August 26, 1988 that if they failed to bring in the necessary I-9 documents, they would be suspended. Counsel represented further that only Bengazi failed to bring in the needed identification while the four other employees, Vangee Justice, Michelle Cope, Theresa McPhail, and James Hayes subsequently brought in the required identification. This letter did not clear up why Bengazi had been suspended on August 26 and created confusion over whether the other employees had been given more time to comply. Later, in a letter to the EEOC dated December 20, 1989, counsel for Shoney's represented that on August 26, 1988, Bengazi, along with five other employees, were told to bring in the required documents within three days to avoid suspension. Joint App. at 331. Again, this did not explain Bengazi's immediate suspension. Shoney's attached the transcript of Bengazi's unemployment compensation appeal to this letter. At the hearing, Emery testified that Bengazi could have had twenty-one days to bring his birth certificate in. It is unclear at what point he could have received this time--before he was suspended or after suspension as a prerequisite to reinstatement. Emery also testified that while he couldn't recall the exact date, Bengazi had been warned about the suspension at least a month before the suspension. Bengazi testified that he had not received a warning and that the first time he was asked to bring in a birth certificate was on August 26. The transcript further confused the issue and did not illuminate why Bengazi had been suspended immediately while others had not. Finally, Emery testified during his own deposition that there were seven people who had incomplete I-9 forms on file, including Bengazi, and that all seven people had been warned a week before August 26 that they were to bring in the required forms or face suspension. We do not consider Emery's deposition as evidence of what the EEOC knew at the time it filed suit. We refer to it only to illustrate how Shoney's failed to dispel the impression that Bengazi had been treated differently than a similarly situated white employee.
 
 III.
 
 22
 Accordingly, the judgment of the District Court is REVERSED. No costs are awarded on this appeal.
 
 
 23
 DAVID A. NELSON, Circuit Judge, dissenting.
 
 
 24
 It is clear, in this circuit, that the permissible scope of a complaint filed by the E.E.O.C. under Title VII of the Civil Rights Act of 1964 is limited by the scope of the investigation that might reasonably have been expected to be conducted by the agency into the charge filed with it by the aggrieved person. See E.E.O.C. v. Bailey Co., Inc., 563 F.2d 439, 446 (6th Cir.1977), cert. denied, 435 U.S. 915 (1978), where we held, among other things, that the federal courts lacked jurisdiction to adjudicate a claim of religious discrimination asserted in a complaint filed by the E.E.O.C. on the basis of its investigation of a charge in which the employee had alleged sex and race discrimination only.
 
 
 25
 The charge filed with the E.E.O.C. by Mr. Bengazi in the case at bar contained no hint of race discrimination. When defendant Shoney's moved for summary judgment, therefore--as it did some eight months after the filing of the E.E.O.C.'s complaint in federal district court--one of the arguments presented by the company was that the E.E.O.C. lacked authority to assert a claim of race discrimination. "This is clearly a case," Shoney's contended, "of the E.E.O.C. taking it upon itself to investigate unalleged race discrimination during the course of an otherwise unrelated sex and national origin investigation, without any valid explanation for its actions." If that characterization was correct, the E.E.O.C. simply had no business adding a race discrimination claim to its complaint.
 
 
 26
 Faced with a summary judgment motion to which it apparently had no adequate response, and its attorneys having been told that Shoney's would seek sanctions against them under Rule 11, Fed.R.Civ.P., if the lawsuit were not dismissed, the E.E.O.C. chose to move for dismissal. The court granted the agency's motion--a disposition that made it unnecessary to rule on Shoney's motion for summary judgment--and the court awarded Shoney's its attorney fees after concluding "that the investigation of Faheem Bengazi's charge was grossly inadequate and that the EEOC's allegations against Shoney's are both unreasonable and groundless."
 
 
 27
 Given the fact that Mr. Bengazi had never charged Shoney's with race discrimination, it is by no means clear to me that the E.E.O.C. would have been entitled to include a race discrimination claim in its complaint even if there had been an adequate investigation. Regardless of the merits of the jurisdictional issue, however, I am not prepared to say, on the record before us, that the district court abused its discretion in awarding attorney fees.
 
 
 28
 The only real question in this regard is whether the employment by Shoney's of Burt Ingram, a white man, following the suspension of Mr. Bengazi, a black man, could reasonably have been thought to support an inference of race discrimination. Mr. Ingram did in fact present a birth certificate, as indicated by the I-9 form he executed on August 27, 1988, a day before he started work, and it is undisputed that Mr. Bengazi would have remained on the job if he too had been able to come up with a birth certificate. Mr. Ingram's August 27 form apparently did not come to the E.E.O.C.'s attention, however, either because the document was not included in the papers received from the Office of Special Counsel for Immigration-Related Unfair Employment Practices or because the document was simply overlooked. An earlier I-9 form, on which the E.E.O.C. clearly did focus, indicated that Mr. Ingram had presented only a social security card, just as Mr. Bengazi had done when he was hired ten months before. The E.E.O.C.'s investigator, Ms. Kephart, apparently made the erroneous assumption that Ingram was allowed to work from August 28 to October 2 without ever having exhibited a birth certificate.[1]
 
 
 29
 Pointing out that the E.E.O.C. (1) never made any attempt to communicate with Mr. Ingram or any of the other employees erroneously assumed to be comparable to Mr. Bengazi, (2) never made any other attempt to authenticate the verification dates on the I-9 forms, (3) never identified for Shoney's the specific employees who were claimed to have been treated more favorably than Bengazi, and (4) failed to recognize that Bengazi had been allowed to work for ten months with only a social security card, whereas Ingram had only worked five weeks, the district court found that "the E.E.O.C. made no attempt to seriously investigate how similarly situated Bengazi was with regard to the rest of Shoney's employees." This finding was not clearly erroneous, in my view. Accordingly, and in view of the fact that the E.E.O.C. was requiring Shoney's to defend itself in federal court against a race discrimination claim conjured up by the E.E.O.C. itself, without any such charge having been made by the employee, I believe it was well within the discretion of the district court to conclude that the E.E.O.C. should not have haled Shoney's into court without having conducted a more thorough investigation.
 
 
 30
 We have no authority to reverse the award of attorney fees unless the award constituted an abuse of discretion on the part of the district court. The award at issue here was supported by a cogently reasoned opinion some 20 pages in length. Based on that opinion, and for the reasons outlined above, I am satisfied that the district court did not abuse its discretion in concluding that Shoney's should be made whole. My colleagues on the panel having seen the matter differently, I respectfully dissent.
 
 
 
 [1]
 Apparently, Bengazi also offered a voter's registration card as proof of identity, which was not accepted. A voter's registration card cannot establish identity under IRCA. A United States Passport, inter alia, can establish both employment eligibility and identity; a state-issued driver's license or picture identification card, inter alia, can establish identity; and a social security number card or birth certificate, inter alia, can establish work eligibility. See 8 U.S.C. Sec. 1342(b)
 
 
 [2]
 We do not imply that United States citizens are not protected from discrimination uder IRCA
 
 
 [3]
 Counsel for Shoney's expressed the following concern with Kephart's assumptions:
 Well, what I'm hearing is a stereotypical discriminatory basis for assuming what the EEOC has assumed in this case; and, when Shoney's, Inc., has been sued and accused of making decisions based on stereotypical discriminatory bases and I'm hearing that the EEOC's decision in this case was based on stereotypical discriminatory assumptions, I get a little concerned and--you know, it's the pot calling the alleged kettle black; and that troubles me....
 Joint App. at 114-15.
 
 
 [4]
 We also agree that EEOC v. Keco Industries, Inc., 748 F.2d 1097 (6th Cir.1984), which held that a court may not inquire into the sufficiency of an EEOC investigation when deciding the merits of a discrimination charge, has no application to this case involving the imposition of attorneys' fees against the EEOC for filing an allegedly frivolous case. If, as an extreme example, the EEOC fails to conduct any investigation whatsoever before filing a charge, a court would be justified in weighing this factor in its decision whether to award attorneys' fees
 
 
 [5]
 In her deposition, Ms. Kephart initially volunteered that Mr. Ingram had produced proper documentation. She quickly recognized that the issue was whether Shoney's had hired people who were comparable to Bengazi in that they did not produce proper documentation, however, and she changed her testimony to say that she did not believe that Ingram and the other allegedly comparable employees had produced such documentation